# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Plaintiff, | No. 3:11-cv-001633 (MPS) |
| v. | |
| EXPEDIENT TITLE, INC., FIRST AMERICAN TITLE INSURANCE COMPANY AND ROBERT TAMBINI, | |
| Defendant. | |

## MEMORANDUM OF DECISION

In filling out a renewal application for a liability insurance policy from the plaintiff, Zurich American Insurance Company ("Zurich"), the insured, Expedient Title, Inc. ("Expedient"), answered "no" to a question about whether any of its officers was the subject of a governmental investigation. At the time, Expedient knew that one of its officers, who was an attorney, was being investigated by a grievance committee of the New York state court system. Expedient believed, however, that the investigation did not relate to its business, which involved acting as a title agent for title insurance companies in real estate transactions, and interpreted the question to ask only about investigations pertaining to this business. Zurich has sued to rescind the policy on the ground that Expedient's "no" answer was a misrepresentation, and now moves for summary judgment.

I must decide whether Expedient's "no" answer was knowingly false when made and material to Zurich's decision to issue the liability insurance policy. If it was, then Zurich would be entitled to rescission and the policy would be treated as *void ab initio* under Connecticut law. Because the question on the renewal application easily embraced the professional disciplinary

investigation of Expedient's officer and because an insured may not escape a finding of knowing

falsity by misinterpreting the plain language of a policy application, I find that Expedient's

answer was knowingly false when made. It was also material. Accordingly, I grant Zurich's

motion for summary judgment, and declare the policy *void ab initio*. In the alternative, Expedient

failed to comply with the "claims made and reported" provision of the policy with respect to the

liability claim for which it seeks coverage because it learned of that claim during the policy

period prior to the one in which it reported the claim to Zurich. As a result, the policy by its

terms thus does not afford coverage.

## I.    **BACKGROUND**

The following facts are taken from the parties' Local Rule 56(a) statements (ECF No. 95,

Plaintiff's Local Rule 56(a)(1) Statement ("Pl.'s L.R. 56(a)(1) Stmt."); ECF No. 111,

Defendant's Local Rule 56(a)(2) Statement ("Def.'s L.R.56(a)(2) Stmt.")), summary judgment

briefs, and exhibits. These facts are undisputed unless otherwise indicated.

Zurich is a New York corporation in the insurance business. (ECF No. 1, Complaint

("Compl.") ¶ 1.) Defendant Expedient Title, Inc., was, at all relevant times, a Connecticut

corporation (with its principal place of business in Greenwich, Connecticut) in the business of

acting as a title agent for title insurance companies (Compl. ¶ 2), including First American Title

Insurance Company of New York ("First American").

### A.    **The E&O Policy**

Zurich issued Expedient a "Title Agents, Abstractors and Escrow Agents Errors and

Omissions Liability Insurance Policy," number EOC 5431154-03, on a claims-made-and-

reported basis, for the policy period from May 27, 2008, to May 27, 2009 (the "E&O Policy").

(Pl.'s L.R. 56(a)(1) Stmt. ¶ 1; Def.'s L.R. 56(a)(2) Stmt. ¶ 1; Affidavit of Steven A. Coploff

("Coploff Aff.") Ex. G, ECF No. 93-7.) The E&O Policy provided that Zurich, the "Company," would pay on behalf of Expedient, the "Insured,"

> all amounts in excess of the Deductible that an Insured becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** that is both made and reported to the **Company** during the **Policy Period** or any Optional Extended Reporting Period based on an act or omission in the **Insured's** rendering or failing to render **Professional Services** for others.

(Coploff Aff. Ex. G, ECF No. 93-7 at 2.) The E&O Policy defines "**Claim Expenses**" as (1) "fees, costs and expenses charged by attorneys retained or approved by" Zurich; and (2) "reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** . . . ." (*Id.* at 8.) A "**Claim**" is "a demand for money or **Professional Services**," (*id.*), and "**Professional Services**" are "services performed . . . by any **Insured**, on behalf of the **Named Certificate Holder**, for others for a fee in any of the following capacities or activities:

1. Title Insurance Agent;

2. Title Abstractor;

3. Title Searcher;

4. Escrow Agent;

5. Closing Agent;

6. Notary Public;

7. Public Records Searcher (including Uniform Commercial Code Searches);

8. Corporate Documents Searcher;

9. Flood Zone Certifications; or

10. Witness Closer."

(*Id.* at 10). The "**Named Certificate Holder**" is "the person or entity identified in Item 2 of the **Certificate of Insurance**," (*id.* at 9), which is Expedient. (*Id.* at 1.) Because the "**Insured**" is defined as the **Named Certificate Holder** and "any person . . . who becomes a partner, officer . .

3

. or employee of the **Named Certificate Holder**" (*id.* at 9), the Insured includes Expedient,

Matthew Kelley, its President (Pl.'s L.R. 56(a)(1) Stmt. ¶ 2; Def.'s L.R. 56(a)(2) Stmt. ¶ 2),

and Robert Tambini, a 50% shareholder and vice-president of Expedient. (Pl.'s L.R. 56(a)(1)

Stmt. ¶ 8; Def.'s L.R. 56(a)(2) Stmt. ¶ 8).

Under the heading "Notice of an Actual Claim," the E&O Policy provided that, "[t]he

**Insured**, as a condition precedent to this policy, shall immediately provide **Notice** to the

**Company** during the **Policy Period** or any Optional Extended Reporting Period of any **Claim**

made against an **Insured**." (Coploff Aff. Ex. G, ECF No. 93-7 at 6.) Under the heading "Notice

of a Potential Claim," the E&O Policy also provided that:

> The **Insured**, as a condition precedent to this policy, shall immediately provide
> **Notice** to the **Company** during the **Policy Period** if any **Insured** has any basis to
> believe that any **Insured** has breached a professional duty or to foresee that any
> such act or omission might reasonably be expected to be the basis of a **Claim**.

(*Id.*) The E&O Policy defined the term "**Notice**" as:

> the **Insured's** providing the following information to the **Company**, either in
> writing or as otherwise authorized by the **Company:**
>
> 1. the description of the alleged act or omission; and
>
> 2. the identities of the claimants or potential claimants; and
>
> 3. the identities of the responsible **Insured(s)**; and
>
> 4. the date and circumstances by which the **Insured(s)** first became aware of the
> act or omission.

(Coploff Aff. Ex. G, ECF No. 93-7 at 9.)

## B.     The Renewal Application

The E&O Policy for the policy period from May 27, 2008, to May 27, 2009, was issued

to Expedient (the "Applicant"), after it submitted a three-page renewal application, signed by

Matthew Kelley as President, on May 2, 2008 (the "Application"). (Pl.'s L.R. 56(a)(1) Stmt. ¶ 2;

Def.'s L.R. 56(a)(2) Stmt. ¶ 2.) Page three of the Application provided that, "BY SIGNING THIS APPLICATION . . . THE APPLICANT AGREES THAT AFTER INQUIRY OF ALL PROSPECTIVE INSUREDS, NO PERSON PROPOSED FOR COVERAGE IS AWARE OF ANY FACT OR CIRCUMSTANCE WHICH REASONABLY MIGHT GIVE RISE TO A FUTURE CLAIM THAT WOULD FALL WITHIN THE SCOPE OF THE PROPOSED COVERAGE." (Pl.'s L.R. 56(a)(1) Stmt. ¶ 3; Def.'s L.R. 56(a)(2) Stmt. ¶ 3; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) On the same page, under the heading "NOTICE TO APPLICANT – PLEASE READ CAREFULLY," the Application stated that "[t]he discovery of any fraud, intentional concealment, or misrepresentation of material fact will render this policy, if issued, void at inception." (Pl.'s L.R. 56(a)(1) Stmt. ¶ 4; Def.'s L.R. 56(a)(2) Stmt. ¶ 4; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) It also stated that "the particulars and statements made in this application . . . shall be the representations of the applicant and the prospective insureds" and "[a]fter inquiry of all prospective insureds, the undersigned authorized officer of the applicant represents that the statements set forth in this application are true and correct." (Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Kelley signed below these statements as the "undersigned authorized officer of the applicant."

Page three of the Application contained questions 19, 20, and 21. Question 19 asked, "[h]as the Applicant or any prospective Insured been involved in or have knowledge of any inquiry, investigation, complaint or notice from any State or Federal Authority regarding the activities, procedures, or practices of the Applicant or any proposed Insured in the past (1) year?" (Pl.'s L.R. 56(a)(1) Stmt. ¶ 7; Def.'s L.R. 56(a)(2) Stmt. ¶ 7; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Expedient answered "No" to this question. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 8; Def.'s L.R. 56(a)(2) Stmt. ¶ 8; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Question 20 asked, "[d]uring the past

(1) year, has any professional liability claim or suit been made against any Applicant or prospective Insured? If "**Yes**," you must complete the enclosed claims addendum for each claim or suit." (Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Beneath question 20, in bold letters, the Application stated, "**[i]t is agreed that any claim mentioned in the statement immediately above is excluded from coverage for the renewal policy period to which this application applies.**" (*Id.*) Expedient answered "No" to question 20. (*Id.*) Question 21 asked, "Does the Applicant or any prospective Insured know of any circumstances, acts, errors or omissions that could result in a professional liability claim against the Applicant?" (Pl.'s L.R. 56(a)(1) Stmt. ¶ 5; Def.'s L.R. 56(a)(2) Stmt. ¶ 5; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Expedient also answered "No" to this question. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 6; Def.'s L.R. 56(a)(2) Stmt. ¶ 6; Coploff Aff. Ex. H, ECF No. 93-8 at 3.)

### C.      Application Incorporated into E&O Policy

The E&O Policy incorporated the Application as part of the entire agreement between the parties. On page three of the Application, below the questions discussed above, the Application stated, "the policy, if issued, is issued in reliance upon the truth of such representations that are incorporated into and made a part of this policy." (Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Moreover, the Certificate of Insurance of the E&O Policy stated, "[b]y acceptance of this policy, the Named Certificate Holder [Expedient] agrees that the statements in the certificate and the application and any attachments hereto are the Named Certificate Holder's agreements and representations and that this policy embodies all agreements existing between the Named Certificate Holder and the Company or any of its representatives relating to this insurance." (Coploff Aff. Ex. G, ECF No. 93-7 at 1.) Similarly, later in the E&O Policy, under the heading "Application," it states:

By acceptance of this policy, the **Insured** reaffirms as of the effective date set forth in the **Certificate of Insurance** that:

1.    the statements in the application(s) and any attachment(s) attached hereto and made a part hereof, and all information communicated by the **Insureds** to the **Company**, either oral or written or electronically submitted, are true and accurate, are specifically incorporated herein, and are all **Insureds'** agreements, personal representations and warranties; and

2.    all such communicated information shall be deemed material to the **Company's** issuance of this policy; and

3.    this policy is issued in reliance upon the truth and accuracy of such representations; and

4.    this policy embodies all agreements existing between the **Insureds** and the **Company**, or any of its agents, relating to this insurance; and

5.    if any representation is false or misleading, this policy shall be void *ab initio*.

(*Id.* at 7.) The Application was also attached to the E&O Policy. (*Id.* at 1.)

### D.    Tambini Grievance

Robert Tambini was, at all relevant times, an attorney and a 50% shareholder and vice-president of Expedient. As an officer, he was an insured under the E&O Policy. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 8; Def.'s L.R. 56(a)(2) Stmt. ¶ 8.) In 2004, Tambini received a notice of a grievance (the "Tambini Grievance") from the Grievance Committee for the 9th Judicial District of New York (the "Grievance Committee"). (Affidavit of Robert Tambini, ECF No. 106 ("Tambini Aff.") ¶ 23; Pl.'s L.R. 56(a)(1) Stmt. ¶ 8.) Zurich alleges that the Grievance Committee was investigating Tambini "for multiple violations of the Code of Professional Responsibility." (Pl.'s L.R. 56(a)(1) Stmt. ¶ 8.) Tambini admits that he received a notice of a grievance from the Grievance Committee, and confirms that, as it was investigating him over the next several years, Tambini periodically provided documents to the Grievance Committee. (Tambini Aff. ¶ 23.) Tambini states that the Tambini Grievance was related to Tambini's

activities as an attorney and his role in Expedient Settlement, Inc., which Tambini contends was separate from his role in Expedient Title, Inc. (Tambini Aff. ¶ 24.)

Tambini testified that "[i]t didn't really occur [to me] to answer yes to . . . question [19] in that the inquiry was an inquiry that I was cooperating and complying with and there was no financial jeopardy. . . . But, I guess, if you consider the Bar Association a state authority . . . that [no answer] would be inaccurate." (Coploff Aff. Ex. M Part III, ECF No. 93-15 at 85-86, Deposition of Robert Tambini ("Tambini Tr.") at 309-10.) Asked again whether "[t]he 'no' would be inaccurate," Tambini testified, "yes." (*Id*. at 310.)

### E.      The Sammy Transaction

Venessa Sammy purchased property at 117-18 150th Avenue South Ozone Park, NY (the "Property") for $600,000.00 (the "Sammy Transaction"). (Coploff Aff. Ex. K, ECF No. 93-11 at 7.) The Sammy Transaction was insured by First American through Expedient, First American's agent. (*Id*.) According to Sammy, "[f]unds for the purchase and clearance of all property obligations were deposited with Expedient and all of the documents including the deed were left with [Expedient] for the appropriate legal filing." (*Id*.) Sammy began paying the mortgage on her new purchase and attempted to sell the property. (*Id*.) During a visit to the property, Sammy saw people doing construction work, and when she accused them of trespassing, they told her that they had purchased the property. (*Id.*) Sammy investigated and learned that Expedient had failed to file any of the closing documents for the Sammy Transaction, and the seller had resold the property to another buyer. (*Id*.)

Expedient received two letters from Washington Title Insurance Company ("Washington Title") in December 2007 (the "December 2007 Letters") and one letter from First American in January 2008 (the "January 2008 Letter") regarding the Sammy Transaction. (Pl.'s L.R. 56(a)(1)

Stmt. ¶ 6; Def.'s L.R. 56(a)(2) Stmt. ¶ 6.) The first letter, dated December 14, 2007, was from

Jody Fay, General Counsel of Washington Title, and stated as follows:

> RE: Your Title No.: X8968
> Premises: 117-18 150th Avenue, South Ozone Park, NY
> Our Title No.: 24749BQ-KP
>
> Dear Mr. Tambini:
>
> Regarding the above, it has recently come to our attention that this transaction was insured by our agent, Bruce Payne Associates, and by your office with conflicting dates and purchasers.
>
> Our insured fee owner acquired title without knowledge of your transaction and as a bona fide purchaser for value. At the closing, the seller's mortgages were also paid in full with the purchase proceeds.
>
> My office has been advised that you may be holding some money in escrow, which may lessen the loss herein. I assume you have contacted your underwriter with respect to this claim.
>
> Please contact me to discuss this as soon as possible, preferably before I refer this matter to our claims counsel.
>
> We intend to protect the interest of our insured pursuant to the terms of the title policy.

(Coploff Aff. Ex. I, ECF No. 93-9 at 1.) Fay sent Tambini a second letter, dated four days later

on December 18, 2007, stating:

> Pursuant to our conversation today, please provide me with a detailed explanation as to what action you have taken with respect to the title claim referenced above.
>
> I am aware that you are holding approximately $500,000.00 in escrow; however, I anticipate that the loss will exceed that amount. Again, I suggest you contact your underwriter with respect to this matter.
>
> Our insured, who acquired title without notice of your pending transaction, intends to demolish the dwelling and rebuild. Time is of the essence with respect to the interest of our insured.

It is preferable to settle the matter without litigation; however, my office needs to be apprised of any and all developments. Please comply with my request immediately.

(Coploff Aff. Ex. J, ECF No. 93-10 at 2.)

Jennifer Vigilante, a claims coordinator at First American, sent a letter to Kelley and Tambini at Expedient regarding the title insurance policy Expedient had issued on behalf of First American relating to the Property. The letter, dated January 16, 2008, and titled "Notice of Claim Received," stated, in relevant part:

We have received the enclosed Notice of Claim concerning the subject policy that was issued by your office. Please take the FOLLOWING ACTIONS IMMEDIATELY:

1.      Put a copy of this notice into your policy file and instruct your staff not to use this policy as a starter/backer without obtaining permission from this office.

2.      Send us email or a fax that addresses the following issues:

a.      Whether the subject policy was paid for;

b.      Whether you believe that the matters raised in the enclosed Notice of Claim are valid; and

c.      Whether you are holding any funds in escrow concerning this matter.

(Coploff Aff. Ex. K, ECF No. 93-11 at 1.) First American's letter also demanded that Expedient send First American the original title file, and "[a]ny other evidence you may have concerning this claim." (*Id.* at 2.) Attached to First American's letter was a letter from Sammy to First American regarding the Property, which stated:

The above reference [sic] property title was insured on May 31st, 2007 through Expedient Title Inc. To this date I do not have a clear title nor were the previous mortgages paid off as arranged at the closing to be done by Expedient. Checks were cut by the banks [sic] attorney to Expedient Title . . . but to this date they still hold these checks in escrow. In addition, my deed and mortgages were not recorded on a timely manner [and] as a result the seller sold the property to South Ozone Park Realty on September 28th, 2007. Steven Rogers acted as power of attorney for the seller (Astenie Sainvil) at my closing on May 31st, 2007. It became apparent that he has some affiliation with Expedient Title through

10

Atlantic Assurance of Stamford CT. He did not contact the seller (Astenie Sainvil) informing her of the completion of the sale and closing. Three months later she sold the property assuming the sale did not materialize since she was unable to contact both Steven Rogers and Expedient Title and there were no publicly recorded documents validating my ownership. In the mean time, [sic] the property was being foreclosed on since Expedient never paid off the mortgages as agreed at the closing. I bought the property for resale and upon attempting to resell the property a title search revealed someone else claimed ownership and was in the process of demolishing the existing structure. I contacted Expedient Title who kept referring me to consult with Steven Rogers. They are both claiming the documents were rejected for recording and the reason the payoffs were not made was because a short sale was being negotiated. I went back and forth with this for over three months with no results. Seven months later Expedient still holds these funds in escrow. I stopped paying the mortgage at Steven Rogers [sic] advice that it was indemnified by Expedient Title . . . . An affidavit was requested of me by Steven Rogers . . . and as of that date I have not heard or seen from him again, nor can he be reached by phone . . . . The sellers [sic] mortgages were never paid off by Expedient but by the new buyers who took claim to the property nor was my mortgage indemnified. I am now left with a 570K mortgage, no title or property, my credited as [sic] been impacted and I face exorbitant legal fees in an attempt to rectify this matter. Both Steven Rogers and Expedient as [sic] made countless false claims and their representative became down right abusive when I asked for proof of the indemnification and to be bonded if in fact my title was being cleared. My attorney will be contacting you with these claims as well. I seek either a clear title so I can proceed with selling this property, compensation for the lost [sic] of profit on my sale, compensation for all legal fees and damage to my credit or complete indemnification of the mortgages I still hold on this property and lost [sic] of profit. It appears the actions of Expedient Title and Steven Rogers are questionable since your organization has not yet been contacted nor has any action been taken to rectify the situation on my behalf. I have suffered tremendous aggravation and hardship as a result of this matter. Please contact me or my attorney Michael Gangadeen as soon as possible to negotiate rectification of this matter.

(*Id*. at 3-4.) Also attached to First American's letter was an affidavit from Sammy, which stated, among other things, that "all of the documents including the deed were left with [Expedient] for the appropriate legal filing," "I immediately caused an investigation to be commenced, and learned that the title company had failed to file any of the closing documents . . . ," and "I ask the Court to award me damages for my loss and punitive damages for the aggravation and embarrassment that the failure to file documents promptly have [sic] caused me." (*Id* at 7.)

### F.      The Sammy Action

On October 2, 2008, Sammy brought an action against Expedient and First American in New York State Supreme Court (Index No. 24400/08), seeking to recover damages from Expedient and First American for, among other things, negligence, bad faith, and breach of contract in connection with Expedient's failure to record the deed of conveyance of the Property (the "Sammy Action"). (Pl.'s L.R. 56(a)(1) Stmt. ¶ 9; Def.'s L.R. 56(a)(2) Stmt. ¶ 9; Coploff Aff. Ex. P, ECF No. 93-18.) On October 28, 2008, First American asserted cross-claims against Expedient in the Sammy Action. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 11; Def.'s L.R. 56(a)(2) Stmt. ¶ 11; Coploff Aff. Ex. Q, ECF No. 93-19.) Expedient notified Zurich of the Sammy Action as a claim under the E&O Policy, and on October 27, 2008, Zurich acknowledged receipt of the claim. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 12; Def.'s L.R. 56(a)(2) Stmt. ¶ 12; Coploff Aff. Ex. R, ECF No. 93-20.) There is no evidence in the record that Zurich received notice of the circumstances leading to the Sammy Action before October 27, 2008. Zurich has been defending Expedient in the Sammy Action, but has reserved all of its rights and defenses under the E&O Policy, including "the right to recover Claim Expenses incurred in connection with the defense of this matter if it is determined that coverage is inapplicable." (Coploff Aff. Ex. S, ECF No. 93-21 at 9.)

### G.      Procedural Background

On October 21, 2011, Zurich filed this action against Expedient seeking a declaratory judgment rescinding the E&O Policy issued to Expedient as void *ab initio*, or in the alternative, an order stating that the E&O Policy does not cover the claims asserted in the Sammy Action because Expedient violated certain policy provisions. (Compl. ¶ 22.) On December 5, 2012, Judge Stefan R. Underhill, then presiding, issued an oral ruling granting First American's motion to intervene as a party defendant. (ECF No. 32.) First American filed an answer, affirmative

12

defenses, and two counterclaims against Zurich on January 3, 2013. (ECF No. 33.) This Court granted Zurich's motion for default judgment against Expedient on April 3, 2014. (ECF No. 75.) The Court also granted Tambini's motion to intervene as a defendant. (*Id.*)

Zurich's complaint against Expedient asserts five counts. Counts One, Two, Three, and Four are pled in the alternative. In Count One, Zurich seeks a declaratory judgment that the errors and omissions insurance policy Zurich issued to Expedient (the "E&O Policy") is *void ab initio*—and Zurich has no duty to provide defense or indemnity coverage for any matters reported to it under the E&O Policy—because of Expedient's alleged misrepresentations on its insurance renewal application. In Counts Two, Three, and Four, Zurich seeks declaratory judgments that it is not obligated to defend or indemnify Expedient with respect to claims made against it by Sammy due to Expedient's alleged violations of three separate E&O Policy requirements. Specifically, Count Two seeks a declaratory judgment that Expedient violated the requirement that claims be made and reported to Zurich during the same policy period. In Count Five, Zurich seeks reimbursement for the costs of defending Expedient in a lawsuit brought by Sammy in New York State court. Zurich has moved for summary judgment on Counts One, Two, and Five of the complaint. As discussed below, I grant summary judgment on Counts One, Two and Five. Counts Three and Four are DISMISSED as moot.

## II.    <u>STANDARD</u>

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116

(2d Cir. 2006) (internal quotation marks and citation omitted). In reviewing the record, the court must "construe the facts in the light most favorable to the non-moving party," *Breyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008), and "resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The ultimate test "is whether the evidence can reasonably support a verdict in Plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000).

## III.   DISCUSSION

### A.   Count One: Rescission of Policy

Zurich seeks rescission of the E&O Policy, arguing that Expedient knowingly made material misrepresentations in May of 2008 when it answered "no" to question 19 on the Application.[1] (ECF No. 96 at 9-16, Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Br.") at 8-15.) Question 19 asked Expedient, "[h]as the Applicant or any prospective Insured been involved in or have knowledge of any inquiry, investigation, complaint or notice from any State or Federal Authority regarding the activities, procedures, or practices of

---

[1] Zurich also seeks rescission on the basis of Expedient's "no" answer to question 21. In response, First American argues that that answer was not "knowingly false" because "Expedient was in possession of a notarized release document, whose language absolved Expedient (and First American) of any liability or potential liability relating to the Sammy Transaction." (Def.'s Opp. Br. at 16 (citing Tambini Aff. ¶ 16; Kelley Aff. ¶ 16).) First American argues that, in light of this release, Expedient did not answer question 21 fraudulently, as it honestly believed that there were no circumstances, acts, errors, or omissions that could result in professional liability claims against it. (Def.'s Opp. Br. at 16.) Because the Court finds that Expedient made a material misrepresentation as to question 19, resulting in the rescission of the E&O Policy, and alternatively, that Expedient violated the "claims made and reported" provision of the E&O Policy (*see* Section B, *infra*), it need not address the arguments regarding Expedient's alleged misrepresentation in response to question 21.

the Applicant or any proposed Insured in the past (1) year?" (Pl.'s L.R. 56(a)(1) Stmt. ¶ 7; Def.'s

L.R. 56(a)(2) Stmt. ¶ 7; Coploff Aff. Ex. H, ECF No. 93-8 at 3.) Zurich argues the "no" answer

voided the E&O Policy because Expedient was aware of the Tambini Grievance, an ongoing

disciplinary investigation of Tambini, a proposed insured, by a state authority, (*see* Pl.'s Br. at

11), and the Application warned that "[t]he discovery of any fraud, intentional concealment, or

misrepresentation of material fact will render this policy, if issued, void at inception." (Pl.'s L.R.

56(a)(1) Stmt. ¶ 4; Def.'s L.R. 56(a)(2) Stmt. ¶ 4; Coploff Aff. Ex. H, ECF No. 93-8 at 3.)

The parties "clearly agreed to make the application for insurance part of the insurance

contract between the parties," *Dobuzinsky v. Middlesex Mut. Assur. Co.*, 49 Conn. App. 398,

405, 714 A.2d 702, 706 (1998) *cert. denied*, 247 Conn. 908, 719 A.2d 902 (1998), by

incorporating the Application as part of the E&O Policy by reference. (*See, e.g.,* Coploff Aff. Ex.

H, ECF No. 93-8 at 3 (stating that "the policy, if issued, is issued in reliance upon the truth of

such representations that are incorporated into and made a part of this policy"); Coploff Aff. Ex.

G, ECF No. 93-7 at 1 (stating that Expedient "agrees that the statements in the certificate and the

application and any attachments hereto" are part of the E&O Policy).) Therefore, when

interpreting the language of the Application, the Court must look at the E&O Policy as a whole.

Under Connecticut law, an insurance policy is interpreted like any other contract.[2] "If the

terms of the policy are clear and unambiguous, then the language, from which the intention of

---

[2] "A federal court sitting in diversity applies the forum state's conflict of law rules to determine which state's substantive law governs the dispute." *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 445 (D. Conn. 2010) (citing *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 496 (1941)). Absent an effective choice of law provision in the contract, Connecticut applies the law of the state with the "most significant relationship" to the transaction and the parties. *Id.* (citing *Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 781 (2000)). For liability insurance contracts, there is a rebuttable presumption in favor of the state "where the insured risk is located." *Id; Reichhold Chemicals, Inc.,* 252 Conn. at 788-89 ("in the absence of extraordinary circumstances, the law of the state where the principal insured risk is located will apply"). Expedient was incorporated in Connecticut and had its principal place

the parties is to be deduced, must be accorded its natural and ordinary meaning." *Nat'l Grange Mut. Ins. Co. v. Santaniello*, 290 Conn. 81, 88, 961 A.2d 387, 393 (2009) (internal citations and quotation marks omitted). "Under Connecticut law, an insurance policy may be voided by the insurer if the applicant made '[m]aterial representations . . ., relied on by the company, which were untrue and known by the assured to be untrue when made.'" *Pinette v. Assurance Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 1995) (quoting *State Bank & Trust Co. v. Connecticut Gen. Life Ins. Co.*, 109 Conn. 67, 72 (1929)). Therefore, to prevail on its claim for rescission, Zurich must prove "(1) a misrepresentation (or untrue statement) by the plaintiff which was (2) knowingly made and (3) material to defendant's decision whether to insure." *Id.* First American argues that there are genuine issues of material fact as to whether Expedient knowingly made false representations in the Application. (ECF No. 110 at 17, First American's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Opp. Br.") at 12.)

### 1.    False Statement

The Connecticut Supreme Court has noted:

> A statement cannot be knowingly false . . . and thus cannot be a misrepresentation in this context, unless it is in fact false. Whether a response to a question in an insurance application is false must be determined in light of the question asked. If the question is so framed as to leave room for two constructions, the words used in it should be interpreted most strongly against the insurer. . . . In determining whether [the insured] responded falsely to the question asked of him, therefore, we must construe the question as a lay person would understand it. . . . [I]f the inquiry is so framed that it does not clearly inform the insured of its meaning, and he may have been honestly mistaken as to what was intended, and his answer, by fair and reasonable construction, may be considered a true one in response to the question as he understood it, such interpretation will be given, and a forfeiture precluded.

---

of business in Connecticut. (Compl. ¶ 2.) Thus, Connecticut has the most significant interest in the E&O Policy. Moreover, although the parties do not discuss choice of law in their memoranda, both parties cite Connecticut case law, "thereby acknowledging that Connecticut law governs this case." *Colony Ins. Co. v. Jack A. Halprin, Inc.*, No. 3:10-CV-1059 CSH, 2012 WL 2859085, at *7 (D. Conn. July 11, 2012).

*Middlesex Mut. Assur. Co. v. Walsh*, 218 Conn. 681, 693-95 (1991) (internal quotation marks and citations omitted).

First American argues that, because question 19 appeared on an application for professional liability insurance, a lay person reading the application could fairly interpret it as applying *only* to the operation of Expedient's business as a title insurance agent. First American argues that the question "is (and was) reasonably understood to inquire about whether Expedient, Kelley and/or Tambini had been *the subject of an inquiry*, investigation, complaint or notice for their activities, practices or procedures *as title agents, abstractors or escrow agents in the operation of Expedient's business (as an issuing agent) for the prior year.*" (Def.'s Opp. Br. at 17 (emphasis added).) Because the Tambini Grievance was related to Tambini's activities as an attorney and his role in Expedient Settlement, Inc., which was separate from his role in Expedient Title, First American argues that Expedient's answer, "no," was truthful. (*Id.*)

Expedient's interpretation of question 19, however, adds words that restrict the broad scope conveyed by the plain language of the question. A reasonable lay person reading the Application could not interpret question 19 as limited to the operation of Expedient's business as a title agent. The words of question 19 plainly ask whether Expedient, or any prospective Insured, including Kelley and Tambini, have "been involved in or have knowledge of *any* inquiry, investigation, complaint or notice from *any* State or Federal Authority regarding the activities, procedures, or practices of the Applicant or any proposed Insured in the past (1) year?" (Pl.'s L.R. 56(a)(1) Stmt. ¶ 7; Def.'s L.R. 56(a)(2) Stmt. ¶ 7; Coploff Aff. Ex. H, ECF No. 93-8 at 3 (emphasis added).) There is no basis to limit the question's scope to investigations related to the title insurance business. Thus, Expedient's response to question 19 was false.

### 2.    Knowingly Made

The Court also finds that Expedient's false response to question 19 was made knowingly. "A misrepresentation is 'knowing' when the insured submits 'an answer to a question in the application other than that which he has reason to believe is true.'" *Assurance Co. of Am. v. Aruri*, No. CV 960559919, 1998 WL 313537, at *2 (Conn. Super. Ct. May 28, 1998) (quoting *Mt. Airy Ins. Co. v. Millstein,* 928 F.Supp. 171, 175 (1991)). Misrepresentations "made because of ignorance, mistake, or negligence," however, are considered "innocent" and "are not sufficient grounds for rescission." *Pinette,* 52 F.3d at 409-10 (citing *Walsh*, 218 Conn. at 691-92).

> When Connecticut courts speak of 'innocent' misrepresentations, they generally have in mind the situation in which the applicant does not know that the information he is providing is false. . . . Under Connecticut law . . . a person may not claim that a misrepresentation is "innocent" solely because the person failed to read the application before signing it. The law requires that the insured shall not only, in good faith, answer all the interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written. Thus, at least in Connecticut, an applicant for insurance has the affirmative duty to inform himself of the content of the application signed by him, under penalty of being bound by the representations as recorded therein.

*Pinette*, 52 F.3d at 410 (internal citations and quotation marks omitted). "[A] misrepresentation will only be considered 'innocent' if the applicant was 'justifiably unaware of its falsity' or 'had no actual or implied knowledge of its existence.'" *Aruri*, 1998 WL 313537, at *2 (quoting *Mt. Airy Ins. Co.,* 928 F.Supp. at 175).

Tambini had been aware of the Tambini Grievance since 2004. (Tambini Aff. ¶ 22.) Kelley was also aware of the investigation, and does not deny that he was aware of it at the time he signed the Application. Rather, Kelley explained that he answered "no" to question 19 because the Tambini Grievance did not involve Kelley's, Tambini's, or Expedient's activities as title agents. (Kelley Aff. ¶¶ 20-27.) First American argues that Zurich "should not be awarded the drastic remedy of rescission based upon Tambini's (and Expedient's) ignorance, mistake, or neglect in reporting matters that he (it) did not believe that there was any obligation to report."

(Def.'s Opp. Br. at 18.) In support of this argument, First American cites the affidavits of both Tambini and Kelley, which suggest that, at the time Kelley signed the Application, neither he nor Tambini believed that they were obligated to disclose the Tambini Grievance in answering question 19. (Affidavit of Matthew Kelley, ECF No. 107 ("Kelley Aff.") at ¶¶ 28; Tambini Aff. ¶ 25, 30.)

Kelley and Tambini do not suggest, however, that they did not remember or did not think about the Tambini Grievance in May 2008, when they were completing the Application. *See Morris I. Olmer, LLC*, 2010 WL 3257673, at *5 (finding "a material issue of fact exists regarding whether [the insured] knowingly made a misrepresentation on the application or whether it was a mere mistake" when the insured did not recall why he did not report a matter on the application, "but it might have been because he did not remember it or did not think about it—not because he attempted to mislead" insurer). Instead, Tambini testified that, "[i]t didn't really occur [to me] to answer yes to that question [19] in that the inquiry was an inquiry that I was cooperating and complying with and there was no financial jeopardy. . . . But, I guess, if you consider the Bar Association a state authority . . . that [no answer] would be inaccurate." (Coploff Aff. Ex. M Part III, ECF No. 93-15 at 85-86, Tambini Tr. at 309-310.) Tambini's cooperation with the inquiry, however, does not make it any less an inquiry that he was "involved in" or of which he "ha[d] knowledge." Similarly, whether or not the inquiry posed a risk of "financial jeopardy" is irrelevant to whether it had to be disclosed at all.

Finally, although First American does not argue this point in its brief, the Grievance Committee is plainly a "state authority." The fact that the words "State," "Federal," and "Authority" are capitalized suggests that they are defined terms, but they are not defined in the Application (Coploff Aff. Ex. H, ECF No. 93-8) or in the E&O Policy. (Ex. G, ECF No. 93-7.)

"Authority" is broadly defined in the dictionary as "[t]he right and power to command, enforce laws, exact obedience, determine, or judge" or "[a] person or group invested with this right and power." WEBSTER'S NEW COLLEGE DICTIONARY 77 (3d ed. 2008); *see Walsh*, 218 Conn. 681, 695 n.7 (1991) ("Connecticut courts have consistently referred to dictionary definitions to interpret words used in insurance contracts.") (internal quotation marks and citations omitted). According to the state website, of which the Court takes judicial notice, *see In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, No. 07 CIV. 10470, 2013 WL 6869410, at *4 (S.D.N.Y. Dec. 30, 2013) (courts may take judicial notice of information found on government websites), the Grievance Committee has the power to "to receive, investigate, and, if necessary, prosecute complaints of professional misconduct against lawyers" under the New York State Rules of Professional Conduct, 22 NYCRR §§ 1200.1 *et seq.* NEW YORK STATE UNIFIED COURT SYSTEM, APPELLATE DIVISION, SECOND JUDICIAL DEPARTMENT, *Attorney Matters,* https://www.nycourts.gov/courts/ad2/faqs.shtml (last visited November 16, 2015). Each grievance committee "consists of 20 [unpaid] members (16 lawyers and 4 non-lawyers) who are appointed by the court," and are "supported by a paid staff of attorneys and investigators who work full time to investigate and, where warranted, prosecute complaints." *Id*. Because the Grievance Committee was created by the New York State court system and has the power to prosecute complaints against attorneys under the New York State Rules of Professional Conduct, it satisfies the broad definition of a "State Authority."

Here, as in *Mt. Airy Ins. Co.,* "[i]t cannot be said that [Expedient] was justifiably unaware of the statement's falsity." 928 F. Supp. at 175; *see Ranger Ins. Co. v. Kovach,* 63 F.Supp.2d 174, 185–86 (D.Conn.1999) (holding that prospective insured's belief that responsive information to questions on an insurance application were of "minor significance" is not a

defense to a claim of knowingness). Question 19 was clear, and First American cannot escape the conclusion that the "no" answer was knowingly false by asserting, essentially, that Kelley and Tambini misread the question. At least where, as here, the question on the application is written in clear terms, allowing an insured to stave off rescission by asserting that he or she was laboring under an erroneous interpretation of the question would be tantamount to excusing the insured for not reading the application at all—something that Connecticut courts have refused to do. *See Pinette*, 52 F.3d at 41("a person may not claim that a misrepresentation is 'innocent' solely because the person failed to read the application before signing it. . . . [T]he insured shall not only, in good faith, answer all the interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written.") Thus, the Court concludes that Expedient made a knowing misrepresentation by answering "no" to question 19, when it had reason to believe that the answer was "yes."

### 3. Materiality

The answer to question 19 is material under Connecticut law and under the E&O Policy. "Connecticut caselaw strongly suggests that an answer to a question on an insurance application is presumptively material." *Pinette*, 52 F.3d at 411 (citing *State Bank & Trust Co.*, 109 Conn. 67, 72 (1929)). An insured's answer to a question on an insurance application is also considered material where the application itself states that it "shall become the basis of any coverage and a part of any policy that may be issued by the [insurance] Company." *Mt. Airy Ins. Co.*, 928 F. Supp. at 176; *see also Murtha v. Golden Rule Ins. Co.*, No. CIV.A.3:98-CV-975JCH, 2001 WL 256145, at *6 (D. Conn. Mar. 5, 2001) (representations were material where "the application specifically sought the information which [the insured] failed to disclose, and the application indicated that the information provided 'will be made a part of any policy/certificate which may

be issued.'"). In question 19, the Application specifically sought the information that Expedient failed to supply, and both the Application and the Certificate of Insurance specifically stated that the Application was incorporated as part of the E&O Policy. Thus, under Connecticut law, Expedient's answer to question 19 was presumptively material. In addition, Expedient agreed that the answer to question 19 was material by entering into its contract with Zurich. The E&O Policy specifically states that "the statements in the application(s) . . . and all information communicated by the Insureds to the Company . . . are true and accurate, are specifically incorporated herein, and . . . shall be *deemed material* to the Company's issuance of this policy . . . ." (Coploff Aff. Ex. G, ECF No. 93-7 at 7 (emphasis added).)

Finally, the answer to question 19 also satisfies the traditional test of materiality. "Under Connecticut law, a misrepresentation is material 'when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" *Pinette*, 52 F.3d at 411 (quoting *Davis Scofield Co. v. Agricultural Ins. Co.,* 109 Conn. 673, 678 (1929)). Under this test, the Court must consider whether, had Expedient answered "yes" to question 19—and completed the claims addenda according to the Application instructions—it would have substantially influenced (1) whether Zurich would have issued the E&O Policy or (2) the rate of the E&O Policy premium.

Expedient's "no" answer on question 19 satisfies this test. The affidavit of a Zurich underwriter shows that, had Expedient disclosed the Tambini Grievance, Zurich would not have authorized the E&O Policy in the form that it was issued. Kathleen Ehrichs, a senior underwriter at Zurich who is responsible for the title agent insurance program administered by Zurich's agent, TitlePac, stated that, had Expedient disclosed the Tambini grievance inquiry on the

22

Application, "TitlePac would have referred the underwriting decision to me. I would have declined to issue the renewal policy or at least issued the policy under different terms and conditions. Under no circumstances would I have authorized the issuance of the policy in the form in which it was issued." (Affidavit of Kathleen Ehrichs, February 6, 2015 ("Ehrichs's Aff."), ECF No. 94 ¶¶ 2, 6); *see, e.g., Pinette*, 52 F.3d at 411 (upholding district court's finding of materiality where underwriter's affidavit stated that insurer "would have turned the plaintiffs down had they known of the earlier fire loss"); *Westport Ins. Corp. v. Gionfriddo*, 524 F. Supp. 2d 167, 177 (D. Conn. 2007) ("affidavit of the underwriter . . . establishes that [insured's] misrepresentation affected the risk assumed by [insurer], that [insurer] reasonably relied on the truthfulness of the answers provided by [insured], and that [insurer] would not have covered [insured] under its policy had it been aware of the misrepresentations he made in his application."); *Ranger Ins. Co.,* 63 F. Supp. 2d at 186 (underwriter's affidavit "unequivocally state[d] that the premium charged . . . would have been significantly higher, if insurance had been offered at all, had [insurer] known that his airman certificate had been revoked 3 years before due to falsification."); *Paul Revere Life Ins. v. Pastena*, No. CV 960132782, 1997 WL 408714, at *5 (Conn. Super. Ct. July 10, 1997) (underwriter's affidavit establishes that if insurer had been aware of falsity of answer, it would not have issued its policy).

First American purports to rebut Zurich's evidence by citing the testimony of another underwriter, but fails to raise a genuine dispute of material fact. Molly Anderson, an underwriter for TitlePac (Coploff Aff. Ex. O, ECF No. 93-17 at 8, Deposition of Molly Anderson ("Anderson Tr.") at 8), testified that if questions 18 through 22 had been answered "yes" by a renewal applicant, "[i]t could have been referred to Zurich. Or *depending on those underwriting guidelines*, it may not . . . have gone to Zurich" for underwriting approval. (*Id*. at 28 (emphasis

added).) Zurich's underwriting guidelines, however, expressly require that TitlePac refer to Zurich for approval, "[a]pplicants with *any* indication of having been involved in *any* kind of professional disciplinary proceedings." (Coploff Aff. Ex. T, ECF No. 93-22 at 9, *Zurich Title Agents, Abstractors and Escrow Agents Errors and Omissions Liability Program Underwriting Guidelines* at 8 (emphasis added).) The ratings sheet shows that, had Expedient disclosed the Tambini Grievance to Zurich, "those facts would have been input into the computer for analysis." (ECF No. 115 at 14, Plaintiff's Reply Memorandum of Law in Further Support of Motion for Summary Judgment, ("Pl.'s Reply Br.") at 13 (citing Coploff Aff. Ex. U, ECF No. 93-23).)

Finally, "in the judgment of reasonably careful and intelligent persons," the fact that Tambini, an officer of Expedient, was being investigated for professional misconduct would increase the degree or character of Zurich's risk in issuing professional liability insurance for Expedient, so as to substantially affect the rate of premium or the decision to provide coverage at all. *See Gionfriddo*, 524 F. Supp. 2d at 176 ("Knowledge that [insured] was involved in numerous acts of misconduct . . . that could have formed the basis for claims against him would have substantially affected [insurer's] decision to provide [insured] with coverage."). For all these reasons, the Court finds, as a matter of law, that Expedient's misrepresentations with respect to question 19 were material.

Because the Court finds that, in answering "no" to question 19, Expedient knowingly made misrepresentations material to Zurich's decision to insure Expedient, the Court grants

Zurich summary judgment as to Count One. As set forth in the Application and the E&O Policy, the E&O Policy is rescinded and deemed void at inception.[3]

### B.     Count Two: Violation of "Claims Made and Reported" Provision

In the alternative, the Court finds that Expedient failed to comply with the "claims made and reported" provision of the E&O Policy. "A claims made and reported policy requires that the claim against the insured, and the report of such claim to its carrier, occur within the same policy period as a precondition to coverage. . . . ." *Nat'l Waste Associates, LLC v. Travelers Cas. & Sur. Co. of Am.*, 51 Conn. Supp. 369, 375 (Super. Ct. 2008) (internal citations and quotation marks omitted) *aff'd, Nat'l Waste Associates, LLC v. Travelers Cas. & Sur. Co. of Am.*, 294 Conn. 511, 512 (2010). The E&O Policy provides that "[t]he Insured . . . shall immediately provide Notice to the Company during the Policy Period . . . of any Claim made against an Insured," (Coploff Aff. Ex. G, ECF No. 93-7 at 6), and obligates Zurich to cover only claims that were "both made and reported to [Zurich] during the **Policy Period.**" (Coploff Aff. Ex. G, ECF No. 93-7 at 2.)

Zurich argues that the December 2007 Letters and the January 2008 Letter gave Expedient notice of a claim relating to the Sammy Transaction during the previous policy period from May 27, 2007, to May 27, 2008, but that Expedient notified Zurich of the Sammy Action as a claim under the E&O Policy during the subsequent policy period—from May 27, 2008, to May 27, 2009—only after it had been served with the complaint in October of 2008. (Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 1, 9, 19-20; Def.'s L.R. 56(a)(2) Stmt. ¶¶ 1, 9, 20.) Zurich acknowledged receipt of the claim on October 27, 2008. (Pl.'s L.R. 56(a)(1) Stmt. ¶ 12; Def.'s L.R. 56(a)(2)

_____

[3] First American's argues that, even if the E&O Policy is rescinded, Expedient is still covered by the "Optional Extended Reporting Coverage," for which Expedient paid Zurich an additional premium of $11,890.00. (Def.'s Opp. Br. at 8, 19, 21-22.) As Zurich points out, this argument is flawed because the Extended Reporting Coverage simply extended the E&O Policy. Since the E&O Policy is rescinded and deemed void at inception, the Extended Reporting Coverage is also rescinded and deemed void at inception. (Pl.'s Reply Br. at 14.)

Stmt. ¶ 12.) Thus, Zurich argues that Expedient violated the "claims made and reported" provision of the E&O Policy.

The Court agrees that the January 2008 Letter was a "claim" within the meaning of the E&O Policy and therefore that Expedient violated the "claims made and reported" provision. The E&O Policy defines a "claim" as "a demand for money or Professional Services."[4] (Coploff Aff. Ex. G, ECF No. 93-7 at 8.) The January 2008 Letter contained a letter from Sammy to First American dated January 11, 2008, which stated that Sammy's "deed and mortgages were not recorded on a timely manner [and] as a result the seller sold the property to South Ozone Park Realty in September 2007," months after Sammy's closing in May of 2007. (Coploff Aff. Ex. K., ECF No. 93-11 at 3.) Sammy's letter also stated that "Expedient never paid off the mortgages as agreed at the closing," and Expedient "made countless false claims" to Sammy. (*Id.*) Sammy sought either clear title or damages, including compensation for lost profits. (*Id.*) These statements suggest that Sammy believed that Expedient's errors or omissions in its professional services as her title insurance agent caused her damages, and that she sought to recover money from Expedient. Also attached to the January 2008 Letter was an affidavit from Sammy, which stated, among other things, that "all of the documents including the deed were left with [Expedient] for the appropriate legal filing," "I immediately caused an investigation to be commenced, and learned that the title company had failed to file any of the closing documents . . . ," and "*I ask the Court to award me damages for my loss and punitive damages for the aggravation and embarrassment that the failure to file documents promptly have [sic] caused me.*" (*Id.* at 7 (emphasis added).) Sammy's request for damages is plainly "a demand for money"

---

[4] The parties and the Court apply the E&O Policy's definition of "claim" because it is not separately defined in the Application, and the Application is incorporated as part of the E&O Policy.

and thus a "claim" under the E&O Policy. Expedient became aware of this claim in January of 2008, but did not report it to Zurich until October 2008, after the previous policy period had ended in May of 2008. Therefore, Expedient failed to notify Zurich of the claim during the policy period in which the claim occurred, and violated the "claims made and reported" provision of the E&O Policy.[5]

Further, even if there were some doubt that the January 2008 Letter constituted an actual "claim," it was certainly notice of a *potential* claim, which Expedient was also obligated to report to Zurich as a precondition for coverage under the E&O Policy. The E&O Policy stated, under the heading "Notice of A Potential Claim," that "[t]he **Insured**, as a condition precedent to this policy, shall immediately provide **Notice** to the **Company** during the **Policy Period** if any **Insured** has *any basis* to believe that any Insured has breached a professional duty or *to foresee that any such act or omission might reasonably be expected to be the basis of a **Claim**.*" (Coploff Aff. Ex. G, ECF No. 93-7 at 6 (italicized emphasis added).) The January 2008 Letter— containing Sammy's complaints about Expedient as her title agent and her demands for damages—certainly gave Expedient a basis to foresee that its acts and omissions "might reasonably be expected to be the basis of a Claim" under the E&O Policy.

### C.     Count V: Reimbursement of Defense Costs

---

[5] Apart from the "claims made and reported" provision of the E&O Policy, the Application itself warned Expedient that there would be no coverage for claims not timely disclosed. Question 20 asked, "[d]uring the past (1) year, has any professional liability claim or suit been made against any Applicant or prospective Insured? If "**Yes**," you must complete the enclosed claims addendum for each claim or suit." (Coploff Aff., Ex. H, ECF No. 93-8 at 3.) Beneath question 20, typed in bold letters, the Application stated, "**[i]t is agreed that any claim mentioned in the statement immediately above is excluded from coverage for the renewal policy period to which this application applies.**" (*Id.*) Because Sammy made a professional liability claim against Expedient within the year preceding May 2008, such a claim would also be properly excluded from coverage under question 20 of the Application.

The Court grants Zurich summary judgment on Count Five because the E&O Policy is void at inception, Zurich expressly reserved its rights to reimbursement for the costs of defending the Sammy Action, and First American did not put forth any arguments in opposition to Count Five.

## IV.   <u>CONCLUSION</u>

The Court GRANTS summary judgment to Zurich on Count One, Count Two in the alternative, and Count Five, and the E&O Policy is rescinded. The Court need not reach the issues raised in Counts Three and Four concerning whether Expedient's claim was barred by some other policy exclusion, and dismisses those counts as moot.

Neither party has filed a dispositive motion regarding First American's counterclaims, the first of which seeks a declaratory judgment as to Zurich's duty to defend and indemnify Expedient in connection with the Sammy Action, and the second of which seeks damages for bad faith denial of coverage. (Coploff Aff. Ex. D, ECF No. 93-4 at 10-13.) In light of this ruling, it appears that these counterclaims should be dismissed. Therefore, First American is ordered to show cause, within 21 days of this order, why the Court should not dismiss its two counterclaims. Within 21 days of this order, Zurich shall file an affidavit together with invoices containing itemized billing entries or other sufficient proof of the defense costs it has incurred. Defendants shall have 21 days to respond.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              December 16, 2015

28